Filed 7/20/26

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| ELIZABETH QUINN et al.,<br><br>      Plaintiffs and Appellants,<br>v.<br><br>MARY R. COULTON et al.,<br><br>      Defendants and Respondents. | A172217, A172811<br><br>(San Francisco County<br> Super. Ct. No. CGC-23-606844) |

After a 100-year storm dropped over five inches of rain on San Francisco in 24 hours, a retaining wall—which separated the backyards of two uphill neighbors from the backyards of two downhill neighbors—failed, "causing soils from the uphill properties to crash down into the backyards of the downhill properties," filling the downhill properties with mud and debris.

The uphill neighbors sued the downhill neighbors, proceeding in part on a theory of strict liability; the downhill neighbors countersued. Following the trial court's ruling on a motion in limine excluding the strict liability claim, the court entered judgment against the uphill neighbors and awarded litigation costs, including expert fees, to the remaining downhill neighbor Mary Coulton.[1]

On appeal, the uphill neighbors challenge the trial court's in limine ruling and the award of expert fees. Because California law does not

---

[1] The other downhill neighbors settled with the uphill neighbors before trial and are not parties to this appeal.

1

recognize a strict liability claim for loss of lateral support absent some excavation activity, we reject the uphill neighbors' challenge to the in limine ruling, but we agree that the award of expert fees was incorrect. Therefore, we will affirm judgment but reverse the order awarding litigation costs to the extent it includes expert fees.

## BACKGROUND

### I. Factual Background

Elizabeth Quinn and Caroline Ayres own residential property next door to Greg Gruszynski and Derrlyn Tom (the uphill neighbors), and their properties sit directly above and uphill from the properties owned by Elysa Stein and Neil Straghalis and their next door neighbor Coulton (the downhill neighbors).

The backyards of the properties were separated "by a 10-inch-thick, concrete retaining wall" that ran diagonally between the uphill and downhill properties for approximately 125 feet. The wall varied in height between eight and 10 feet, and the parties estimate that it was built in the 1940s before they purchased their properties and had never been modified.

In December 2022, after a "100 year rainstorm that was bookend[ed] by atmospheric rivers" produced so much rainfall "that people were kayaking through the streets" of San Francisco, the retaining wall failed. Approximately 10 cubic feet of dirt and debris from the uphill backyards slid into the downhill backyards resulting in significant damage to all four properties.

Several days after the wall failed, the San Francisco Department of Building Inspection (DBI) issued notices of violation for unsafe building conditions to the owners of all four properties and required them to rebuild the wall. In March 2023, Gruszynski and Tom contacted DBI, which abated

2

the notices of violation for the uphill neighbors only, and this litigation ensued.

## II. Procedural Background

In July 2023, the uphill neighbors filed their operative first amended complaint, asserting claims for nuisance, negligence, and "loss of lateral and subjacent support."[2] The amended complaint sought monetary relief for physical damage to the properties, out of pocket costs for repairs, loss of use and value, and emotional distress.

In August 2023, the downhill neighbors filed their operative first amended cross-complaint for nuisance, negligence, and trespass, seeking compensation for property damages, loss of use, and emotional distress.

In June 2024, Coulton served two Code of Civil Procedure[3] section 998 (section 998) offers to compromise:[4] one offer to Quinn and Ayres jointly for $5,000 and a separate offer to Gruszynski and Tom jointly for $5,000. Under the terms of the offers, the uphill neighbors would dismiss their claims against Coulton; the offer excluded any compromise of Coulton's cross-claims. Neither offer was accepted within 30 days after they were made and thus expired by operation of law. (§ 998, subd. (b)(2).)

---

[2] As a basis for the loss of lateral support claim, the uphill neighbors cited Civil Code section 832, which provides, in part: "Each coterminous owner is entitled to the lateral and subjacent support which his land receives from the adjoining land, subject to the right of the owner of the adjoining land to make proper and usual excavations on the same for purposes of construction or improvement . . . ."

[3] Further undesignated statutory references are to the Code of Civil Procedure.

[4] Section 998 allows the offering party to recover costs if an offer to settle is not accepted and the party to whom the offer was made fails to obtain a more favorable judgment or award. (§ 998, subd. (c)(1).)

In July 2024, Coulton filed a motion for judgment on the pleadings and a related request for judicial notice seeking dismissal of the uphill neighbors' third cause of action for removal of lateral support. The uphill neighbors opposed the motion, arguing that that common law provided an " 'absolute right' " to lateral support, which was subsequently codified by Civil Code section 832 as a "statutory right of support." (Italics omitted.)

On reply, Coulton argued that Civil Code section 832 codified common law applicable to the excavation of land from neighboring properties and thus had "no application [to] this case since there was no excavation work performed or even alleged" in the uphill neighbors' amended complaint.

After a hearing in August 2024, the court (Hon. Charles F. Haines) denied the motion, explaining that even though "excavation is not an issue in this case, so the exceptions provided for in [Civil Code section] 832 are not applicable," plaintiffs "at a minimum . . . stated a cause of action for negligence." In this appeal, the uphill neighbors do not challenge the court's August 2024 ruling.

In September 2024, the court granted Stein's and Straghalis's motion for good faith settlement, leaving Coulton as the sole defendant and cross-complainant.

In advance of the October 2024 trial, the parties filed several motions in limine, including, as relevant here, Coulton's motion in limine for an order excluding claims for strict liability or negligence per se based on Civil Code section 832. Coulton "anticipated" that the uphill neighbors would "argue that Civil Code [section] 832 provides for strict liability. It does not." Rather, according to Coulton, the "applicable standard for a finding of liability is negligence, not strict liability." Coulton further asserted that the uphill neighbors could not establish a claim for negligence per se, "especially where

4

there is no excavation at issue," because Civil Code section 832 "applies *only* in the context of excavation."

The uphill neighbors opposed the motion, arguing Civil Code section 832 "codified" an " 'absolute right' " to lateral support and thus downhill neighbors were strictly liable for any damages from loss of lateral support: "even if a [retaining] wall failure is unintended and unforeseeable, and even if the [downhill neighbor] used the utmost care and skill to prevent a wall failure, when a wall failure nonetheless occurs and removes lateral support, the [downhill neighbor] is liable for any consequential damages."

On October 17, 2024, the court (Hon. Braden C. Woods) heard argument on Coulton's motion in limine to exclude claims for strict liability and negligence per se but reserved ruling until the first day of trial (October 21). On that date, the court granted the motion in part, explaining that it "respectfully and totally" disagreed with the uphill neighbors' strict liability theory and stated it "[would] not be giving that instruction to the jury." Earlier that same day, the uphill neighbors had voluntarily dismissed "with prejudice" their nuisance and negligence claims against Coulton.

Thus, "Given the court's ruling and given that [the uphill neighbors had] dismissed [their] first two causes of action," counsel for the uphill neighbors suggested Coulton move to dismiss the remainder of the case. Coulton's counsel did so and "ask[ed] the court to enter a judgment in favor of Defendant [Coulton]." The uphill neighbor's counsel verbally stated that they "oppose[d]" the motion, which the court granted "Over [the uphill neighbors'] objection."

5

The trial court entered judgment in Coulton's favor in October 2024,[5] and the uphill neighbors filed a timely notice of appeal (No. A172217).

In November 2024, Coulton filed a memorandum of costs and then filed an amended memorandum the same day. As relevant here, Coulton sought to recover $32,960.15 in expert fees pursuant to section 998.

The uphill neighbors moved to tax Coulton's costs, arguing in relevant part that the section 998 offers to compromise were "invalid as a matter of law" because they were made as two lump-sum offers—one to Quinn and Ayres jointly and another to Gruszynski and Tom jointly—instead of apportioning the amounts to each individual plaintiff. "Because there is no way to tell how much each plaintiff would receive under a joint offer," the uphill neighbors argued that "it cannot be determined whether each plaintiff's recovery was 'more favorable' than the offer," rendering the offers invalid.

Coulton filed an opposition, asserting the offers were valid because the uphill neighbors shared "a common interest for the recovery of damages to their respective properties which they each owned."[6] Coulton further asserted it was "not a close call" that the uphill neighbors failed to obtain a more favorable result because they "voluntarily chose to dismiss their claims moments before trial" and thus recovered nothing.

On reply, the uphill neighbors disputed Coulton's common interest argument: "Quinn and Ayres were legally separated when they received

---

[5] The judgment "does not mention the cross-complaint" since, as the trial briefs represent, Coulton had settled her remaining cross-claims against the uphill neighbors before trial.

[6] According to discovery responses, Quinn's and Ayers's property was held by a living trust, and Gruszynski and Tom were tenants in common.

6

[Coulton's] offer, and Tom and Gruszynski have never been married to each other."

After hearing argument in February 2025, the court issued an order in March 2025, granting in part and denying in part the motion to tax costs. As pertinent here, the court denied the motion to tax Coulton's expert fees, "adopt[ing] the reasoning and analysis in [Coulton's] papers" and "find[ing] the two . . . section 998 offers were both valid."

The uphill neighbors filed a timely notice of appeal from the order on their motion to tax costs (No. A172811), which was subsequently consolidated with their first filed appeal from judgment (No. A172217).[7]

## DISCUSSION

"This appeal presents two issues," according to the uphill neighbors. First, the uphill neighbors argue that the trial court erred in deciding there was no strict liability lateral support claim. Second, the uphill neighbors contend that Coulton's expert fees should have been taxed because "lump-sum joint offers to multiple plaintiffs that required them to apportion the amounts among themselves" are "invalid as a matter of law." We disagree with the uphill neighbors on the first point: In California, there is no claim for strict liability claim for loss of lateral support absent excavation. But we agree that the joint section 998 offers were invalid.

---

[7] After oral argument but before we issued this opinion, the California Supreme Court held that plaintiffs cannot appeal from a voluntary dismissal of their action. (*Maniago v. Desert Cardiology Consultants' Medical Group, Inc.* (July 16, 2026, S290188) ___ Cal.5th ___ [2026 Cal. LEXIS 3698].) Because the uphill neighbors appeal from judgment and a postjudgment order on expert fees, *Maniago* does not impact our decision.

7

## I. Lateral Support Claim

Citing Miller & Starr, California Real Estate (4th ed. 2026), which, while a "learned treatise," is not binding authority, the uphill neighbors assert that California recognizes a " 'strict liability' " claim for "removal of lateral support." (*Ammerman v. Callender* (2016) 245 Cal.App.4th 1058, 1086 ["treatises . . . are not binding"].)  However, the uphill neighbors' strict liability theory is premised on the incorrect belief that, under common law, the right to lateral support exists independently of excavation activities.  Thus, to demonstrate that the uphill neighbors' strict liability theory lacks any legal basis, we begin by explaining the origin of the common law right to lateral support and its subsequent modification through Civil Code section 832.

Lateral support is the support received by a parcel of real property from the sides by adjacent pieces of real estate or, as in this case, a retaining wall. (*Marin Municipal Water Dist. v. Northwestern Pac. R. Co.* (1967) 253 Cal.App.2d 83, 89 [lateral support is the support provided along " 'a vertical plane' "]; *Sager v. O'Connell* (1944) 67 Cal.App.2d 27, 30 (*Sager*) [lateral support provided by "bulkhead"].)

"At common law every owner of land was entitled to lateral support of that land from every other coterminous owner.  This was an absolute right incident to the land itself." (*Wharam v. Investment Underwriters, Inc.* (1943) 58 Cal.App.2d 346, 349 (*Wharam*).)  Thus, a "coterminous owner *who excavated* upon his property, by the exercise of proper care and the application of proper means of support, was compelled to protect adjoining property in its natural state from sliding into the excavation." (*Wharam*, at p. 349, italics added, citing *Aston v. Nolan* (1883) 63 Cal. 269; see also *Green v. Berge* (1894) 105 Cal. 52, 58 ["the adjoining lotowner *who caused the*

*excavation* to be made would be responsible for any damage which might result, irrespective of the question of negligence in making the excavation" (italics added)].) This liability for excavation irrespective of negligence is referred to as strict liability. (*Holtz v. Superior Court of San Francisco* (1970) 3 Cal.3d 296, 301, fn. 3 ["At common law a coterminous owner was strictly liable for damages resulting from the withdrawal of lateral support"].)

There are some limitations to this common law "absolute right" to lateral support that implicates strict liability. (*Wharam*, *supra*, 58 Cal.App.2d at p. 349.) To start, the right extends to the protection of "the land in its *natural* state, without the added weight of a building upon it." (*Empire Star Mines Co. v. Butler* (1944) 62 Cal.App.2d 466, 533; see also *Aston v. Nolan*, *supra*, 63 Cal. at p. 273 ["excavation must be such as would not have caused the soil of the adjacent lot to tumble in had it remained in its natural state—not built upon"].) Similarly, under common law, an injured landowner cannot recover damages caused by excavation on noncontiguous property unless the damages resulted from the negligence of the excavator. (*Puckett v. Sullivan* (1961) 190 Cal.App.2d 489, 495 ["liability for damages to a noncontiguous tract must rest upon negligence"].)

Even with these limitations, by the 1870s, the expansive nature of strict liability "had become burdensome and unrealistic among changing conditions involving the growth of urban communities . . . and the commonplace necessity of surface excavation for building purposes." (*Marin Municipal Water Dist. v. Northwestern Pac. R. Co.*, *supra*, 253 Cal.App.2d at pp. 95–96.) Thus, the Legislature enacted Civil Code section 832 to "relax" the common law rule by eliminating absolute or strict liability for excavation

in specified circumstances.[8] (*Marin Municipal Water Dist.*, at p. 95; see also *Wharam, supra*, 58 Cal.App.2d at p. 349 [Civ. Code, § 832 codified a "relaxation of the common law rule"].) However, Civil Code section 832 did not change the baseline rule that a landowner who negligently excavated would be liable for any damage to the property and/or improvements. (*Wharam*, at p. 349 ["All that said section does is to permit a land owner to excavate, freed from the absolute common law right of lateral support . . . provided that negligence of the excavator is not the proximate cause of damage"]; see also *Lee v. Takao Bldg. Development Co.* (1985) 175 Cal.App.3d 565, 568 (*Lee*) ["One who negligently withdraws lateral support of another's land or the buildings on that land is subject to liability for harm resulting to the land or the buildings"].)

And where an excavation has caused the removal of lateral support, the subsequent transfer of the excavated property to a third party does not necessarily relieve the excavating party from liability. (See *Platts v. Sacramento Northern Ry.* (1988) 205 Cal.App.3d 1025, 1030–1031 & fn. 2 [Civ. Code, § 832 "does not affect the rules imposing liability on *the actor who removes the support*" (italics added)].) This liability remains because "the damage to the surface land from the removal of [lateral] support occurs at the time of the excavation," even though "the cause of action does not accrue until subsidence." (*Platts*, at p. 1031.) Thus, "a landowner who took title and possession after the occurrence of the act causing the removal of the lateral support, and uncontrovertedly did not participate in the act that resulted in

---

[8] Civil Code section 832 contains four requirements including notice to adjoining landowners and use of "ordinary care and skill" "[i]n making any excavation." Because it is undisputed that "[t]his case involves no excavation," we do not detail the statutory requirements.

the removal of the support, is not responsible in damages." (*Lee*, *supra*, 175 Cal.App.3d at p. 569.)

To summarize, under California common law, the default rule is that "the party who removes the [lateral] support is absolutely liable for damages caused by subsidence" and a subsequent owner will not be liable absent independent negligence. (*Platts v. Sacramento Northern Ry.*, *supra*, 205 Cal.App.3d at pp. 1030–1031; accord, *Lee*, *supra*, 175 Cal.App.3d at p. 569; *Sager*, *supra*, 67 Cal.App.2d at p. 33.) Here, the uphill neighbors disavow negligence as the basis for their claim, and there are no allegations or evidence that Coulton conducted any excavation activity. Accordingly, the uphill neighbors' strict liability claim fails because Coulton did not engage in any excavation activities to which liability may attach.

To be sure, the uphill neighbors expressly do not challenge trial court's finding that "excavation is not an issue in this case" and affirmatively argue to us that "[t]his case involves no excavation." Yet, they claim that "mere inaction [is] enough to find the defendant liable for failure to provide lateral support" citing *Sager*, *supra*, 67 Cal.App.2d at pages 29–30. However, this claim mischaracterizes *Sager*'s holding. In *Sager*, the court determined that any liability on the defendant's part was not based on "mere inaction," as the uphill neighbors contend, but instead resulted because the defendant "had permitted the bulkhead to become decayed," i.e., acted negligently. (*Id.* at p. 30 [reversing judgment for cross-complainant where retaining wall "had been erected by [cross-defendant's] predecessor in title"].) Indeed, *Sager* explained that the initial excavation, which was performed by a previous owner, "was made with due care and adequate precaution was taken to sustain respondent's property. The sole fault of appellants', if any exists, *lies in negligently permitting the lateral support to weaken*." (*Id.* at p. 32, italics

11

added; see also *Lee*, *supra*, 175 Cal.App.3d at p. 569 [noting that *Sager* required "some act of negligence in connection with the lateral support" to find lability].) Thus, *Sager*'s reliance on negligence undermines rather than supports the uphill neighbors' strict liability theory.

Likewise, the uphill neighbors attempt to distinguish *Lee*, *supra*, 175 Cal.App.3d at page 569, which rejected a lateral support claim similar to that of the uphill neighbors because, according to the uphill neighbors, *Lee* "involved the removal of lateral support for a building, not for land—a critical distinction."[9] Not so. To the extent *Lee* involved loss of lateral support for a building, as opposed to damage to land in its natural state, it was not "a critical distinction" or even a determinative factor in the Court of Appeal's rejection of liability. Rather, the Court of Appeal in *Lee* determined liability did not exist against the non-excavating defendant because the defendant "became the owner of the property nearly two months after the completion of the demolition . . . by a previous owner," and the previous owner's excavation "caused the removal of [plaintiffs'] lateral support." (*Id.* at pp. 568–569.) Thus, *Lee* supports the trial court's rejection of the uphill neighbors' strict liability claim because, as the uphill neighbors describe in their appellate briefing, Coulton was "a non-excavating neighbor." (Italics omitted.)

Finally, the uphill neighbors claim "the right to lateral support can also be framed as negligence per se." Preliminarily, California does not recognize an independent cause of action for negligence per se; rather, it is an

---

[9] We note that the uphill neighbors' property also contained improvements, i.e., buildings, for which they sought "out of pocket costs to attempt to mitigate the damage and repair." But common law strict liability extends only to the property in its "*natural* state, without the added weight of a building upon it." (*Empire Star Mines Co. v. Butler*, *supra*, 62 Cal.App.2d at p. 533.)

evidentiary presumption used to establish one of the several elements necessary to prove negligence.  (*Rosales v. City of Los Angeles* (2000) 82 Cal.App.4th 419, 430 [rejecting argument that negligence per se is "an 'independent' cause of action" because negligence per se "concerns the *standard* of care, rather than the *duty* of care"]; Evid. Code, § 669.)  As such, "an underlying claim of ordinary negligence must be viable before the presumption of negligence [per se] of evidence Code section 669 can be employed."  (*California Service Station Etc. Assn. v. American Home Assurance Co.* (1998) 62 Cal.App.4th 1166, 1178.)  Because the uphill neighbors voluntarily dismissed their negligence claim with prejudice, they eliminated any basis for applying a negligence per se presumption.  (*Id.* at p. 1180 [the negligence per se presumption "applies only after determining that the defendant owes the plaintiff an independent duty of care"].)

In any event, the negligence per se claim asserted by the uphill neighbors is premised on Civil Code section 832 and therefore fails for the precise reason stated by the trial court and accepted by the uphill neighbors: "Excavation is not an issue in this case."  As above, because there is no allegation or evidence that Coulton conducted any excavation activities, the uphill neighbors fail to establish that Civil Code section 832 is the appropriate standard of care for negligence per se.  (See *Quiroz v. Seventh Ave. Center* (2006) 140 Cal.App.4th 1256, 1285 [negligence per se requires showing that the damage was caused by "an occurrence the nature of which the statute . . . was designed to prevent" and the plaintiff "was one of the class of persons for whose protection the statute . . . was adopted," both of which are "determined by the court as a matter of law"].)

Ultimately, the uphill neighbors' claim for loss of lateral support fails because, whether framed as a claim based on strict liability or negligence per

13

se, there are no allegations nor any evidence of excavation by Coulton, which is a prerequisite under both common law and Civil Code section 832.

## II.  Expert Fees

With respect to costs, the uphill neighbors "appeal only one aspect of the Order:  the award of $32,960.15 in expert fees to Coulton under . . . section 998."  The uphill neighbors argue that Coulton's " 'single, lump-sum offer to multiple plaintiffs' " was invalid and thus could not serve as a basis for awarding expert fees.  In response, Coulton contends that the lack of apportionment does not invalidate the offers because she achieved an "unqualified result" in her favor and "a unity of interest existed between" the uphill neighbors.

We agree with the uphill neighbors.  Here, Coulton's section 998 offers to multiple plaintiffs with individual claims (including damages for emotional distress) are invalid and cannot be saved by the unity of interest exception.

Section 998 was enacted to encourage and expedite settlements before trial " 'by providing a strong financial disincentive to a party—whether it be a plaintiff or a defendant—who fails to achieve a better result than that party could have achieved by accepting his or her opponent's settlement offer.' " (*Madrigal v. Hyundai Motor America* (2025) 17 Cal.5th 592, 603.)  Thus, "[i]f an offer made by a defendant is not accepted and the plaintiff fails to obtain a more favorable judgment or award," then under section 998, "the plaintiff shall not recover his or her postoffer costs *and* shall pay the defendant's costs from the time of the offer," including, in the court's discretion, "a reasonable sum to cover . . . the services of expert witnesses."  (§ 998, former subd. (c)(1),[10] italics added.)

---

[10] Because we assess the validity of Coulton's offers at the time they were served, we quote from the 2024 version of section 998 (i.e., the version of

Where a party's request for costs pursuant to section 998 is challenged, " '[t]he burden is on the offering party to demonstrate that the offer is valid under section 998.' " (*Covert*, *supra*, 73 Cal.App.5th at p. 832; see also *Peterson v. John Crane, Inc.* (2007) 154 Cal.App.4th 498, 505–506 (*Peterson*).) If the offeror shows the section 998 offer is valid (i.e., sufficiently certain), then the burden shifts to the offeree to show the offer was not made in good faith. (*Covert*, at p. 833; *Peterson*, at p. 506.) " ' "We independently review whether a section 998 settlement offer was valid," ' " strictly construing the offer in favor of the party sought to be bound by it and resolving any ambiguity against the offer's proponent. (*Covert*, at pp. 832–833.) In assessing the validity of a section 998 offer, we "look[ ] beyond the simple fact of the joint offer to see if it could be determined whether the party awarded costs had actually received the more favorable judgment." (*Stallman v. Bell* (1991) 235 Cal.App.3d 740, 746 (*Stallman*).)

## A. Validity of Offers to Multiple Plaintiffs

"California courts uniformly recognize as invalid an unallocated offer from a defendant to multiple plaintiffs with separate claims where the offer is conditioned on acceptance by all." (*Gonzalez v. Lew* (2018) 20 Cal.App.5th 155, 161; see also *Burch v. Children's Hospital of Orange County Thrift Stores, Inc.* (2003) 109 Cal.App.4th 537, 544 [" 'A single, lump sum offer to multiple plaintiffs which requires them to agree to apportionment among themselves is not valid' "].)

---

the statute in effect when the settlement offers were made). (*Covert v. FCA USA, LLC* (2022) 73 Cal.App.5th 821, 833 (*Covert*) [" ' "we must consider the validity of section 998 offers as of the date the offers are served" ' "].) The subsequent amendments changed the pronouns used in the statute and do not impact our analysis or disposition. (Sen. Bill No. 577 (2023–2024 Reg. Sess.) § 2.)

This general rule of apportionment reflects two concerns. First, an unapportioned offer to multiple plaintiffs can unnecessarily confuse the subsequent assessment of whether any single plaintiff received a more favorable outcome. (*Taing v. Johnson Scaffolding Co.* (1992) 9 Cal.App.4th 579, 583 (*Taing*) ["a lump-sum offer to several plaintiffs jointly with no indication of how the offer is to be allocated among them has been held too uncertain to trigger section 998 penalties"].) In the same vein, joint lump-sum offers frustrate the recipients' ability to determine whether the offer was reasonable. (*Id.* at p. 585 ["from the perspective of the offeree, the offer must be sufficiently specific to permit the individual [recipient] to evaluate it and make a reasoned decision whether to accept"].) Second, joint offers can deter settlement in contravention of section 998's purpose because an individual recipient who wishes to settle is "at the mercy" of any corecipient who unreasonably refuses. (*Taing*, at p. 584; see also *Meissner v. Paulson* (1989) 212 Cal.App.3d 785, 791 ["the Legislature did not intend to place this burden on offerees"].)

Here, Coulton's unapportioned offers to the uphill neighbors implicate both concerns. In addition to hindering an assessment of reasonableness by the uphill neighbors, the joint offers would have complicated any subsequent determination of whether an individual plaintiff received a more favorable outcome, because Stein and Straghalis were still parties to the litigation when the offers were made. Thus, any emotional distress damages would have needed to have been apportioned among the downhill neighbors as severally liable defendants, instead of being awarded as part of a single, lump-sum verdict. (*Taing, supra*, 9 Cal.App.4th at p. 584 ["in post-Proposition 51 cases, where each defendant is only jointly liable for the plaintiff's economic damages but severally liable for noneconomic damages in

16

proportion to that defendant's degree of wrongdoing (Civ. Code, § 1431.2), the validity of such an offer is questionable"]; see also *Lakin v. Watkins Associated Industries* (1993) 6 Cal.4th 644, 658, fn. 9 [noting a potential "issue of apportionment" where a single plaintiff makes "an undifferentiated settlement offer to both defendants" and then obtains "a judgment for which defendants [are] not jointly liable"].)  Additionally, the uphill neighbors could not have accepted Coulton's section 998 offer without the concurrence of the other offeree, frustrating the intent behind section 998.  (*Taing*, at p. 584 [§ 998 offer invalid where "it requires any [party] who wants to accept to obtain the concurrence of his or her [corecipients]"].)

Relying on *Stallman*, *supra*, 235 Cal.App.3d 740, and *Winston Square Homeowner's Assn. v. Centex West, Inc.* (1989) 213 Cal.App.3d 282, Coulton argues her section 998 offers were valid because, at the time of enforcement, the trial court "was faced with an unqualified result in favor of [Coulton]" and thus the court "could easily compare the outcome to the offer to assess whether [Coulton] had in fact prevailed."  But *Stallman* and *Winston Square* are unhelpful because they do not involve a joint offer *to* multiple plaintiffs *by* an individual defendant and thus do not implicate the same concerns discussed here.  (*Stallman*, at p. 747 [affirming award of costs based on § 998 offer *to multiple defendants* by wrongful death/personal injury plaintiffs, because "there [was] but a single verdict to be compared to a single offer"]; *Winston Square*, at p. 293 [affirming award of costs based on section 998 offer made *to a single plaintiff* (a homeowner's association) by multiple defendants]; see also *Kahn v. The Dewey Group* (2015) 240 Cal.App.4th 227, 237–244 [declining to follow "*Winston Square*'s 'absolute prevailing party' approach" to evaluating joint § 998 offers].)

### B. Unity of Interest Exception

There is an exception to the general rule that section 998 offers to multiple plaintiffs are invalid: "[W]here there is more than one plaintiff, a defendant may still extend a single joint offer, conditioned on acceptance by all of them, if the separate plaintiffs have a 'unity of interest such that there is a single, indivisible injury.'" (*Peterson*, *supra*, 154 Cal.App.4th at p. 505.) Courts have found such a unity of interests between married plaintiffs in a suit arising "out of their purchase of community property" (*Vick v. DaCorsi* (2003) 110 Cal.App.4th 206, 212) as well as between plaintiffs with a singular cause of action, such as wrongful death (*McDaniel v. Asuncion* (2013) 214 Cal.App.4th 1201, 1206–1208 [§ 998 offer "made *to* multiple plaintiffs" in wrongful death case valid because the claim is "atypical" and "any recovery is in the form of a lump sum, i.e., a single verdict is rendered for all recoverable damages"].)

According to Coulton, the uphill neighbors share a unity of interest because they "filed the same operative pleading asserting the same causes of action" and "provided identical discovery responses when asked to identify the injuries suffered and damages sought in the action." We are not persuaded.

To start, none of the uphill neighbors' claims (negligence, nuisance, or loss of lateral support) have been recognized as a claim that gives rise to a unity of interests. (See, e.g., *McDaniel v. Asuncion*, *supra*, 214 Cal.App.4th at p. 1206 [wrongful death claim gives rise to a unity of interest among "all heirs"].) Moreover, while the uphill neighbors filed a single operative pleading in this case, each neighbor did so in their individual capacity (cf. *Peterson*, *supra*, 154 Cal.App.4th at p. 506 [unity of interest existed where a single plaintiff sued in multiple capacities, i.e., as an individual, successor-in-

18

interest, and legal heir, because "there was still only one plaintiff"]), and each neighbor sought unique emotional distress damages, which are recoverable under each of their nuisance claims. (*Kornoff v. Kingsburg Cotton Oil Co.* (1955) 45 Cal.2d 265, 275 [damages for "discomfort and annoyance directly resulting from an injury to real property" are recoverable in a nuisance claim]; *Hensley v. San Diego Gas & Electric Co.* (2017) 7 Cal.App.5th 1337, 1348–1352 [emotional distress damages available "even though [the plaintiff] was not physically present to see the fire ravage his house and land"].) And while their individual discovery responses were at times identical, each of the uphill neighbors still provided unique details supporting individual emotional distress damages. For instance, Quinn purportedly witnessed the incident while Ayers did not but still suffered from anxiety.

Additionally, to the extent *Vick v. DaCorsi*, *supra*, 110 Cal.App.4th at page 212, recognizes a unity of interest based on marriage, Coulton makes no such argument here. In the trial court, the uphill neighbors presented evidence that Gruszynski and Tom were tenants in common and "have never been married to each other," and Quinn and Ayers were "legally separated when the received [Coulton's] Section 998 Offer."[11] Coulton offered no contradictory evidence, instead arguing that it was "irrelevant whether they are married." Even on appeal, Coulton's argument regarding the uphill neighbors' relationship status is contained only in a footnote. Thus, Coulton

_____

[11] "Because '[t]he earnings and accumulations of a spouse . . . while living separate and apart from the other spouse, are the separate property of the spouse' [citation], the date of separation can be of considerable consequence with regard to the parties' property rights." (*In re Marriage of Manfer* (2006) 144 Cal.App.4th 925, 929; see also *In re Marriage of Lee & Lin* (2019) 41 Cal.App.5th 698, 700 [affirming "trial court's determination that the parties legally separated in May 2012 when respondent moved out of the family residence"].)

has forfeited any argument that a unity of interest exists based on marriage. (*Doe WHBE 3 v. Uber Technologies, Inc.* (2024) 102 Cal.App.5th 1135, 1152 [declining to consider argument raised for the first time on appeal]; *Alexander v. Exxon Mobil* (2013) 219 Cal.App.4th 1236, 1260, fn. 10 [declining to consider respondent's argument in a footnote].)

Ultimately, showing a unity of interest is an exception to the general rule that joint section 998 offers to multiple plaintiffs are invalid; thus, Coulton, as the party seeking to recover expert costs, bore the burden of demonstrating such a unity of interest existed. (*Peterson, supra,* 154 Cal.App.4th at p. 505; *Covert, supra,* 73 Cal.App.5th at p. 832.) Given Coulton's failure to establish a unity of interest based upon the uphill neighbors' claims, damages, or relationship status, we fail to see how Coulton satisfied her burden of showing the unity of interest exception applies here to save her otherwise invalid joint section 998 offer. Accordingly, the award of expert fees cannot stand. (See, e.g., *Williams v. The Pep Boys Manny Moe & Jack of California* (2018) 27 Cal.App.5th 225, 243 [reversing award of expert fees because § 998 offer to multiple plaintiffs, who were the adult children of the decedent, was invalid since the children "were not seeking to recover for a single, indivisible injury"].)

## DISPOSITION

The October 29, 2024 judgment is affirmed (No. A172217). The March 3, 2025 order on the uphill neighbors' motion to tax costs is reversed in part (No. A172811). The trial court is directed to enter an order striking Coulton's expert witnesses' costs in the amount of $32,960.15. The March 3, 2025 order is otherwise affirmed.

In the interests of justice, we decline to award costs of appeal. (Cal. Rules of Court, rule 8.278(a)(5).)

DESAUTELS, J.

We concur:

RICHMAN, ACTING P.J.

MILLER, J.

*Quinn et al. v. Coulton et al.* (A172217, A172811)

Trial Court:                          San Francisco County Superior Court

Trial Judge:                         Hon. Braden C. Woods

Attorneys for Plaintiffs
and Appellants:                    Blum & Ho, LLP
                                            Steven A. Blum
                                            Gary Ho

Attorneys for Defendants
and Respondents:                Alves Radcliffe LLP
                                            Suzanne M. Alves